| | | |
|---|---|---|
| MICHAEL RUBIN<br>*Plaintiff*, | )<br>) | 3:17-CV-01529 (KAD) |
| | ) | |
| v. | ) | |
| | ) | |
| ADT, LLC<br>*Defendant*. | )<br>) | SEPTEMBER 12, 2019 |

**MEMORANDUM OF DECISION**

Kari A. Dooley, United States District Judge

This employment discrimination action arises out of the termination of Michael Rubin ("Rubin") during a reduction in force ("RIF") at ADT, LLC ("ADT") in 2016. Rubin asserts claims for disability and age discrimination under the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-51 et seq. ("CFEPA"). ADT has moved for summary judgment as to both claims. For the reasons set forth in this decision, ADT's motion for summary judgment is GRANTED in part and DENIED in part.

**Factual Background[1]**

Rubin initially worked as a service technician and supervisor for a series of companies that were ultimately acquired by ADT's former parent company in 1998. (Def.'s SMF at ¶ 2.) Prior to this acquisition, Rubin was counseled for performance deficiencies and demoted from a supervisor position back to a technician position. (*Id.* at ¶ 3.) Rubin was later promoted back to a supervisor position shortly before ADT's acquisition of the predecessor company. (*Id.*)

On April 25, 2012, Rubin (then age 54) was promoted to the position of Installation Team Manager in the Shelton office of ADT's Connecticut/Western Massachusetts market area. (*Id.* at

---

[1] Unless otherwise indicated, the following facts are either undisputed or construed in a light most favorable to Rubin, the non-moving party.

¶¶ 8–9.) During 2012, Rubin began to experience balance issues. (*Id.* at ¶ 12; *see also* Plf.'s Response to Def.'s SMF at ¶ 12.) Rubin recalls one episode in the summer of 2012 when he fell, but it was not at work. (Def.'s SMF at ¶ 13.)

On July 15, 2013, Rubin received a written warning because his technicians were refusing to pick up additional work, and Rubin could not be reached to address the problem. (*Id.* at ¶ 14.) In response, Rubin filed a rebuttal in which he explained that the telephone call at issue occurred on a Saturday while he was having a serious conversation with his father. (Plf.'s Dep. at 59–60.) He maintains that he called back as soon as his conversation with his father was over, which was approximately an hour after receiving the initial call. (*Id.*)

The following month, on August 9, 2013, Rubin was coached for below standards mobility utilization, not fulfilling his administrative requirements, and not updating safety websites on a monthly basis. (Def.'s SMF at ¶ 15; Def.'s Ex. 13.) On October 11, 2013, Rubin was placed on a Performance Improvement Plan ("PIP") due to his continued failure to meet the job requirements of an Installation Team Manager. (Def.'s SMF at ¶ 16; Def.'s Ex. 14.) In the PIP, Rubin's supervisor noted that he had previously communicated with Rubin concerning "stranded capacity jobs, techs schedules not being full and backlog management." (Def.'s Ex. 14.) He further noted that although Rubin had received coaching regarding his response to an injured employee in July, Rubin had recently failed to report another injury in a timely fashion. (*Id.*)

In 2013, Rubin was also misdiagnosed with multiple sclerosis before being re-diagnosed with isolated myelitis. (Def.'s SMF at ¶ 17.) Rubin did not receive any medication for his condition. (*Id.*) Although Rubin never reported his medical condition to human resources, he did tell his colleagues at ADT about his health issues and began using a cane while in the field. (Def.'s SMF at ¶¶ 18–19; Plf.'s Dep. at 30–35.)

On January 22, 2015, one of Rubin's team members was injured while using a personal knife in violation of company policy. (Def.'s SMF at ¶ 24.) During a review of this incident on March 19, 2015, Rubin was reminded that personal tools, such as knives or box cutters, were not approved for use by technicians. (*Id.* at ¶ 25; Def.'s Ex. 17.)

In May 2015, Anthony Peluso became the Area General Manager and Rubin's supervisor. (Def.'s SMF at ¶ 29.) Thereafter, on May 19, 2015, another team member under Rubin's supervision was injured while using an unauthorized knife. (*Id.* at ¶ 27.) The injury occurred during a safety audit and in front of the safety director. (Peluso Dep. at 39; *see also* Plf.'s Dep. at 82; Stewart Dep. at 22.) In response, Peluso issued Rubin a "final warning" and admonished him concerning the need to improve. (Def.'s SMF at ¶ 28; Def.'s Ex. 17.)

Around this time, Susan Masella, an installation coordinator in the Shelton office, heard Rubin discuss his doctor's appointments and treatment plan with Peluso. (Masella Dep. at 33.) She further heard Peluso make comments to Rubin and others in the office regarding Rubin's gait and instability "in a joking fashion" or in a "condescending manner." (*Id.* at 13, 31; *see also id.* at 25.) Masella thought that Peluso seemed "very agitated with the fact that [Rubin] was unsteady on his feet" and his comments about Rubin made her uncomfortable. (*Id.* at 31–32.) Peluso denies making these remarks or ever talking with anyone about Rubin's gait or health, in a joking manner or otherwise. (Peluso Dep. at 53, 128–29.)

In November 2015, Masella was terminated as part of a RIF. (Def.'s SMF at ¶ 32.) The following month, in December 2015, Peluso (then age 29) swapped Rubin (then age 57) and Edwin Sepulveda, a Service Team Manager, (then age 51) in their respective managerial roles. (Def.'s SMF at ¶¶ 52–54, 71; Peluso Dep. at 13; Plf.'s Ex. K at 15.)

In approximately August 2016, ADT decided to eliminate one of its seven manager positions in the Connecticut/Western Massachusetts area market as a necessary reduction in force. (Def.'s SMF at ¶ 55.) Similar RIFs were occurring in other regions across the country. (*Id*. at ¶ 56.) Consistent with ADT's standardized RIF process, Michael Stewart (then approximately age 54), from human resources, collected information and data on the seven eligible managers, including Rubin. (*Id.* at 58.) Stewart collected each of the manager's last two performance appraisals and looked for disciplinary actions in the previous five years.[2] (Stewart Dep. at 24, 32–33.) He then provided this information and a RIF worksheet to Peluso (then age 30), who rated the managers on a scale of 1 to 5 on four key competencies or skills with a possible high score across all categories of 20. (Def.'s SMF at 59–60; *see also* Def.'s Ex. 19; Plf.'s Ex. L.)

The completed RIF worksheet contained the following relevant information:

---

[2] Rubin maintains that Stewart looked back only two years for disciplinary history and, therefore, his pre-2014 disciplinary history, having not been considered, is irrelevant in this action. As a factual matter, Rubin is mistaken. Stewart did testify that he looked back only two years for performance appraisals. When asked how far back he looked for disciplinary actions, however, Stewart responded:

> I don't know how far back they went. But the one or two that — again, on memory that I'm aware of — were fairly recent in the last — again, going on memory, five years or less. I think the most recent one was — was a couple, two years ago from the day he was terminated back in, what, December 2016.

(Stewart Dep. at 32–33.) Later, Stewart reaffirmed that he believed that Rubin's 2013 disciplinary actions would have been looked at and that he was aware that Rubin had a disciplinary history, including a final written warning. Accordingly, Rubin's pre-2014 disciplinary history, having been relied upon in the determination to terminate his employment, is relevant to the Court's analysis of Rubin's claims.

| Last Name | First Initial[3] | Title | 2015 Performance | Leadership | Talent Management | Customer Focus | Total Score |
|---|---|---|---|---|---|---|---|
| Gajewski | J. | Mgt Team Install | 2 | 3 | 3 | 5 | 13 |
| Lamonica | A. | Mgt Team Service | 2 | 1 | 1 | 4 | 8 |
| Ortega | J. | Mgt Team Install | 2 | 2 | 2 | 5 | 11 |
| Rubin | M. | Mgt Team Service | 2 | 1 | 1 | 5 | 9 |
| Sepulveda | E. | Mgt Team Install | 2 | 3 | 3 | 5 | 13 |
| Shea | P. | Mgt Team Service | 4 | 3 | 4 | 4 | 15 |
| White | D. | Mgt Team Install | 4 | 3 | 3 | 5 | 15 |

(Def.'s Ex. 19; Plf.'s Ex. L.)

The RIF worksheet further noted that none of the managers had any corrective action in the past twelve months. (*Id.*) In the notes section, however, Peluso highlighted Rubin's older disciplinary history and other performance shortcomings.[4] (*Id.*) He similarly noted that another manager, J. Ortega, was given a final warning the prior year for improper use of a company credit card but had since been in compliance. (*Id.*) Overall, Rubin received the second lowest score of the seven managers on the RIF worksheet. (*Id.*; Def.'s SMF at ¶ 66.) The only manager to receive a lower score, A. Lamonica (then age 48), was also the only female manager and had no disciplinary record. (Def.'s SMF at ¶ 66.)

---

[3] To protect their privacy, the Court has omitted the first names of the other managers considered during the RIF.

[4] The note stated:

> Michael was issued a final (5/21/15) and verbal coaching on management. His technician was carrying a non ADT approved tool (Box Cutter). Michael has also showed lack of leadership and management to his direct reports; proper inventory counts were not conducted as required by AGM, no auditing on time tickets prior to AGM requirements.

(Def.'s Ex. 19; Plf.'s Ex. L.)

5

Peluso provided the completed worksheet to Stewart, who forwarded it to the ultimate decision-makers in ADT's legal and human resources departments. (Stewart Dep. at 24, 60–61.) Stewart testified that he knew Rubin would be selected even before the official decision was made based on Rubin's ranking. (*Id*. at 61.)

In October 2016, and prior to his termination, Peluso allegedly "made a crack about me, my abilities with my walk." (Rubin Dep. at 39.) Rubin responded by asking, "Do I need to go to the ethics line?" (*Id.*) Peluso allegedly retorted, "You wouldn't dare," and walked away. (*Id.*) Rubin did not thereafter report this exchange to anyone at ADT. (*Id.* at 40.)

Sometime thereafter, Rubin was officially selected for termination. (Def.'s SMF at ¶ 69.) Rubin's termination was effective on December 1, 2016. (*Id.* at ¶ 70.) ADT did not subsequently fill Rubin's vacated managerial position; instead, other managers absorbed Rubin's duties. (*See id.* at ¶ 72.) In March 2017, Peluso was terminated due to the still on-going RIFs. (*Id.* at ¶ 75.) In October 2017, Stewart was terminated due to the RIFs. (*Id.* at ¶ 76.)

Additional facts will be set forth as necessary.

**Standard of Review**

The standard under which the Court reviews motions for summary judgment is well-established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under governing law," while a dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court's inquiry focuses on "whether there is the need for a trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id*. at 250. As a result, the moving party satisfies his burden under Rule 56 "by showing . . . that there is an absence of evidence to support the nonmoving party's case" at trial. *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (internal quotation marks omitted). Once the movant meets his burden, the nonmoving party must set forth "'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "[T]he party opposing summary judgment may not merely rest on the allegations or denials of his pleading" to establish the existence of a disputed fact. *Id.*; *accord Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted; internal quotation marks omitted). Nor will wholly implausible claims or bald assertions that are unsupported by evidence. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian,* 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003)). "In deciding a motion for summary judgment, the district court's function is not to weigh the evidence or resolve issues of fact; it is

confined to deciding whether a rational juror could find in favor of the non-moving party." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002).

**Discussion**

The CFEPA prohibits employers from discriminating against employees on the basis of certain characteristics, including physical disability or age. Conn. Gen. Stat. § 46a-60(b)(1). CFEPA claims are analyzed under the familiar burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *Clark v. Stop & Shop Supermarket Co.*, No. 3:15-cv-00304 (JCH), 2016 WL 4408983, at *3 (D. Conn. Aug. 16, 2016); *see Feliciano v. Autozone. Inc.*, 316 Conn. 65, 73 (2015) ("We look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both.").

"Under this framework, a plaintiff must first establish a *prima facie* case of discrimination." *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010). "The burden of proof that must be met to permit an employment discrimination plaintiff to survive a summary judgment motion at the prima facie stage is *de minimis.*" *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (alteration omitted; internal quotation marks omitted). To establish a *prima facie* case of discrimination, "a plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination." *Ruiz*, 609 F.3d at 491–92. "Because an employer who discriminates is unlikely to leave a 'smoking gun' attesting to a discriminatory intent, a victim of discrimination is seldom able to prove his claim by direct evidence and is usually constrained to rely on circumstantial evidence." *Chambers*, 43 F.3d at 37. "Circumstances contributing to a permissible inference of discriminatory intent may include the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the

plaintiff's qualifications to fill that position, or the employer's criticism of the plaintiff's performance in ethnically degrading terms, or its invidious comments about others in the employee's protected group, or the more favorable treatment of employees not in the protected group, or the sequence of events leading to the plaintiff's discharge, or the timing of the discharge." *Id.* (citations omitted).

"Once the plaintiff has presented a prima facie case of discrimination, the defendant has the burden of producing, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. After the defendant has articulated such nondiscriminatory reasons, the plaintiff has an opportunity to show that the reason was merely a pretext for discrimination. Pretext may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence or by reliance on the evidence comprising the prima facie case, without more." *Id.* at 38 (citations omitted; emphasis omitted; internal quotation marks omitted).[5]

**Disability Discrimination Claim (Count One)**

ADT contends that the record establishes that Rubin was terminated because of his poor work performance and disciplinary history, in conjunction with the RIF, rather than because of

---

[5] The parties dispute whether the "but for" standard or "mixed motive" standard applies to disability discrimination claims brought under the CFEPA. In *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009), the United States Supreme Court adopted the "but for" standard for claims brought under the Age Discrimination in Employment Act of 1967. *Id.* at 169–170. The Second Circuit Court of Appeals recently expanded this holding to disability discrimination claims brought under the Americans with Disabilities Act. *Natofsky v. City of New York*, 921 F.3d 337, 341 (2d Cir. 2019). The Connecticut Supreme Court and the Connecticut Appellate Court have not addressed to what extent, if any, *Gross* changes the legal landscape for claims brought under the CFEPA. There is non-binding precedent on both sides of the issue. *Weisenbach v. LQ Mgmt.*, No. 3:13-cv-01663 (MPS), 2015 WL 5680322, at *7–*8 (D. Conn. Sept. 25, 2015) (collecting cases). Whether the more stringent "but for" standard or "mixed motive" standard applies is not dispositive for purposes of summary judgment. Accordingly, the Court assumes that the "but for" standard applies.

9

any disability, perceived or otherwise. Rubin argues that Peluso's comments about his gait, scoring of the RIF worksheet, and disparate treatment of disabled and non-disabled employees establish that Peluso discriminated against him based on a perceived disability during the RIF process.[6]

Here, there is evidence that Peluso perceived Rubin to be disabled. Masella testified that she heard Rubin discuss his doctor's appointments and treatment plan with Peluso; (Masella Dep. at 33.); that she heard Peluso make derogatory comments about Rubin's gait and instability on "six or seven" occasions prior to her termination; (*id.* at 13, 31); and that Peluso seemed "very agitated with the fact that [Rubin] was unsteady on his feet"; (*id.* at 32). Rubin similarly testified that in or about October 2016 Peluso "made a crack about me, my abilities with my walk." (Rubin Dep. at 39.) Although Peluso denies making any of these remarks, the Court must construe all of the evidence in a light most favorable to Rubin. Upon doing so, the Court concludes that there is a genuine issue of material fact as to whether ADT, through Peluso, perceived Rubin to be disabled.

ADT next asserts that Rubin cannot establish that the circumstances of his termination give rise to an inference of discriminatory intent for purposes of demonstrating his *prime facie* case.[7] Rubin argues that discriminatory intent can be inferred not only from the testimony cited above regarding Peluso's derogatory comments, but also from Peluso's questionable, and arguably

---

[6] In seeking summary judgment, ADT first asserts that there is no evidence that Rubin was disabled or that ADT was aware of Rubin's disability, assuming he had one. It is certainly undisputed that Rubin never reported any disability to ADT. However, ADT's assessment, even if accurate, does not end the inquiry. Rubin does not proceed on a theory that ADT was aware of an actual disability when it terminated him. Rather, Rubin's claim is premised on the theory that ADT, through Peluso, perceived him to be disabled and treated him adversely because of that perception. The CFEPA applies with equal force to claims based on actual or perceived physical disabilities. *Desrosiers v. Diageo N. Am., Inc.*, 314 Conn. 773, 786 (2014).

[7] Peluso was not the final decision-maker for the RIF in 2016 that resulted in Rubin's termination. So, the Court assumes that Rubin proceeds under a Cat's Paw theory of liability. "Under a Cat's Paw theory of liability, a discriminatory motive may be imputed to a final decision-maker if the decision-maker's adverse employment action was proximately caused by a subordinate who had a discriminatory motive and intended to bring about the adverse employment action." *Natofsky*, 921 F.3d at 350 (internal quotation marks omitted). Courts in this District have previously applied the Cat's Paw theory in CFEPA employment discrimination cases. *Delgado v. City of Stamford*, No. 3:11-cv-01735 (VAB), 2015 WL 6675534, at *19 (D. Conn. Nov. 2, 2015) (collecting cases).

manipulative, scoring on the RIF worksheet. Rubin also argues that discriminatory intent may be inferred from Peluso's disparate treatment of non-disabled managers — namely, P. Shea, Ortega, and J. Gajewski — when handling both disciplinary matters and scoring the RIF worksheet. The Court agrees with Rubin that there are triable issues of fact on this issue.

First, Rubin argues that discriminatory intent can be inferred from Peluso's derogatory comments about his gait, which were overheard by both him and Masella. ADT responds that this is too great an inferential leap because the remarks overheard by Masella were mere "stray remarks" and temporally remote from Rubin's termination. The Court is not persuaded. Masella testified that she heard Peluso making joking and derogatory remarks about Rubin on multiple occasions to Rubin and others. *See Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 124 n.12 (2d Cir. 2004) (rejecting characterization of remarks about plaintiff's motherhood as "stray remarks" where they were "made repeatedly"). And although the remarks Massella heard were temporally remote to Rubin's termination, Rubin also testified that Peluso made a derogatory remark to him about his gait in October 2016, two months before his termination. Together this evidence supports an inference of animus toward Rubin because of his perceived disability, an animus that persisted until shortly before his termination.

ADT alternatively contends that any inference that Peluso was biased against Rubin is undermined by the fact that Peluso moved Rubin into a leadership role the year before Rubin's termination. Under the so-called same-actor inference, when the individual who made the discharge decision is the same individual who hired the employee, and the hiring or and discharge occur within a relatively short time span, an inference can be made that discrimination was not a motivating factor in an employee's discharge. *Jetter v. Knothe Corp.*, 324 F.3d 73, 76 (2d Cir. 2003) ("when the person who made the decision to fire was the same person who made the decision

11

to hire, especially when the firing occurred only a short time after the hiring, it is difficult to impute [to the decisionmaker] an invidious firing motivation that would be inconsistent with [the] decision to hire."). Under the facts and circumstances of this case, as discussed above, the same actor inference does not eliminate the genuine issues of material fact concerning discriminatory intent. *See Varno v. Jefferson Cty. Dep't of Planning*, No. 7:11-cv-00803, 2015 WL 5602965, at *5 (N.D.N.Y. Sept. 23, 2015) ("The same-actor inference is not dispositive, however, when the decisionmaker makes comments demonstrating discriminatory animus."), *aff'd sub nom. Varno v. Canfield*, 664 Fed. Appx. 63 (2d Cir. 2016) (summary order). ADT is free to argue the inference at trial and it will be for the jury to determine what if any weight to give to the fact that Peluso moved Rubin into another supervisory role the year before his termination.

Finally, Rubin argues that certain peculiarities in the scoring of the RIF worksheet further support the inference that Peluso deliberately scored it to ensure that he was selected. The Court agrees. As previously discussed, Stewart asked Peluso to complete a RIF worksheet. Peluso and Stewart testified that the overall ratings of the managers for each employee was supposed to be based on their 2015 Performance Evaluations. Yet, in some respects, Rubin's scores on the worksheet do not align with his 2015 Performance Evaluation, to his detriment. For example, in his 2015 Performance Evaluation, Rubin scored a 3 overall and a 3.5 in leadership competencies, but Rubin's score for 2015 Performance on the RIF worksheet is a 2 and his Leadership is a 1. Notably, had Rubin's ratings in the RIF worksheet aligned with his 2015 Performance Evaluation in these areas, Rubin's score would have been three points higher overall and one point higher than Ortega. And a jury could reasonably conclude that Ortega was also a possible candidate for reduction and might have been selected instead of Rubin had Rubin's score been fairly calculated.

All of this evidence, in sum, is grist for the jury's mill. It is not for this Court, on summary judgment, to decide the impact or import of the evidence. Rather, the Court merely determines whether there is sufficiently competing evidence on issues of material fact so as to require a trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial"). Here, there are genuine issues of material fact concerning Rubin's *prima facie* case.[8]

Once a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to offer a legitimate non-discriminatory reason for the termination. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 38 (2d Cir. 1994). Rubin does not contest that ADT can meet this burden. It is undisputed that ADT was undergoing a series of nationwide RIFs around the time period that Rubin was terminated. Once the defendant comes forward with a legitimate non-discriminatory reason for the termination, the burden shifts back to the plaintiff to establish that the purported reason is mere pretext and that the termination was the result of discriminatory animus.

---

[8] The Court does not rely on any claim by Rubin that he was subject to disparate treatment as means to infer discriminatory intent. The evidence submitted, in the Court's view, does not support any such claim. For example, Rubin takes issue with the fact that Shea was not punished for a subordinate's motor vehicle accident in early 2014 and that the incident was not mentioned in the RIF worksheet. But there is little to no evidence before the Court concerning this accident or Shea's discipline for it. Without such evidence it would be mere speculation that Peluso's failure to include this incident in the RIF worksheet was the result of discriminatory animus. Similarly, the record does not support a disparate treatment argument with respect to Ortega. Like Rubin, Ortega was disciplined for misconduct, *i.e.*, his misuse of a company credit card, and the misconduct was highlighted on the RIF worksheet. Nor is there anything inherently suspect about Ortega receiving a 2 in the Leadership category on the RIF worksheet, as Rubin suggests, in light of his total leadership competencies score on his 2015 Performance Evaluation. Finally, Rubin complains that Gajewski was not punished for one of his employees not wearing appropriate footwear, nor was it put on the RIF worksheet. Rubin equates this incident with the two incidents in which two of his team members were injured while using unauthorized knives or box cutters. Again, there is insufficient evidence before the Court regarding the footwear incident, making an inference of disparate treatment purely speculative. Rubin also suggests that Gajewski received inflated scores on the RIF worksheet, but the record does not support this contention either.

On the issue of pretext, Rubin relies on the same evidence used to establish his *prima facie* case as discussed above. A plaintiff may rely upon the same evidence in establishing both the *prime facie* case and pretext once the burden shifts back. *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 402 (2d Cir. 1998); *DeAngelo v. Yellowbook Inc.*, 105 F. Supp. 3d 166, 177 (D. Conn. 2015). ADT responds that the undisputed facts establish that Rubin was selected for reduction because his performance and disciplinary record were worse than his peers. The Court disagrees that this fact is undisputed. As previously discussed, there is evidence from which a jury could reasonably conclude that but for Peluso deliberately downgrading Rubin on the RIF worksheet he might not have been selected for the RIF, as the next lowest scoring manager, Ortega, also had a disciplinary history and performance issues. Construing all of the evidence in a light most favorable to Rubin, the Court concludes that there are triable issues of fact not only with respect to his *prime facie* case but also on the issue of pretext. The motion for summary judgment is denied as to Count One.

**Age Discrimination Claim (Count Two)**

ADT also moves for summary judgment on Rubin's age discrimination claim, arguing that none of the circumstances surrounding Rubin's termination give rise to a reasonable inference of age discrimination. Rubin responds that age discrimination can be inferred from Peluso's comparative youth and the fact that Peluso treated younger employees more favorably. The Court concludes that Rubin cannot establish a *prima facie* case of age discrimination.

It is well established that "a jury cannot infer discrimination from thin air." *Norton v. Sam's Club*, 145 F.3d 114, 119 (2d Cir. 1998). As the Second Circuit has noted:

> It is not infrequent that people who are dismissed are fired by managers who differ from them in some respect — managers who are younger or older, or of a different race or gender. If that fact, without more, could suffice to support the finding of discrimination . . . , it would be hard to imagine a termination that could not be attributed to discrimination.

*Id*.

Here, Rubin identifies no evidence, direct or circumstantial, that age discrimination played a role in his termination. The mere fact that Peluso is younger than Rubin and may have treated him unfairly during the RIF process, is legally insufficient on its own to establish a triable age discrimination claim. Rubin contends that other, younger managers — Shea, Ortega, and Gajewski — were not disciplined as harshly and were treated more favorably during the RIF. As previously noted, the facts do not support Rubin's disparate treatment claims regarding Shea, Ortega, and Gajewski. *See* footnote 6 of this decision. In addition, Peluso appears to have treated Sepulveda, who was 52 years old at the time of the RIF, favorably. Peluso provided Sepulveda with favorable scores on the RIF, and Sepulveda tied for the second highest ranked manager. Rubin further testified that after he was terminated Sepulveda assumed his duties before resigning one or two months later.[9]

It is but pure speculation that ADT discriminated against Rubin on the basis of age. The motion for summary judgment as to count two is granted. *See Norton*, 145 F.3d at 120 (reversing jury verdict in favor of plaintiff where record was "devoid of evidence, direct or circumstantial, sufficient to support a finding that Sam's Club fired Norton because of his age").

**Conclusion**

For the reasons set forth in this decision, ADT's motion for summary judgment [ECF No. 42] is GRANTED as to Count Two and DENIED as to Count One.

---

[9] Rubin now maintains that the younger Gajewski assumed his duties. The Court rejects this assertion because Rubin himself testified that Sepulveda assumed his duties after his termination. (Rubin Dep. at 106, 116–17.) Peluso's testimony was less clear, as he could not remember precisely what happened, but he indicated that Gajewski and Sepulveda at differing times absorbed Rubin's duties. (Peluso Dep. at 124.)

**SO ORDERED** at Bridgeport, Connecticut, this 12th day of September 2019.

                                       */s/ Kari A. Dooley*
                                       KARI A. DOOLEY
                                       UNITED STATES DISTRICT JUDGE